**AMERICAN BANK & TRUST COMPANY IN MONROE**

v.

**M. W. JOSTE, R. H. Martin, William Nathan, and Power Oil Company.**

**Civ. A. No. 13562.**

United States District Court,
W. D. Louisiana,
Monroe Division.

Oct. 19, 1970.

the Reserve, but has never suggested that they resign their commissions.

844

Charles H. Ryan, Boles, Talley & Ryan, Monroe, La., for plaintiff.

Jake B. Clegg, Jr., Saccommanno, Clegg & Martin, Houston, Tex., B. Roy Liuzza, Hudson, Potts & Bernstein, Monroe, La., for M. W. Joste, R. H. Martin and Power Oil Co.

William D. Brown, Theus, Grisham, Davis & Leigh, Monroe, La., for William Nathan.

## OPINION

DAWKINS, Chief Judge.

This action is brought under the civil liability provisions of the Securities Act of 1933 by the American Bank and Trust Company in Monroe, Louisiana, against (1) William Nathan, (2) the Power Oil Company, (3) R. H. Martin and M. W. Joste, president and secretary respectively of the Power Oil Company at the time of the questioned transactions.[1] Plaintiff seeks to impose joint and several (*in solido*) liability under the provisions of the Act for its alleged damages.

The multi-party, multi-"deal" situation presented by this case not only is a factual labyrinth but a legal snarl as well, with new, indeed somewhat bizarre, theories of law being urged with each of the many briefs submitted. We will not here describe or review the factual circumstances or collateral legal theories which are irrelevant to decision of this case.

American Bank and Trust Company, through Sebron Sneed, its executive vice president, executed two loans represent-

1. A judgment by default was secured against defendant Dalton Smith. The plaintiff secured a judgment on the note against Robert A. Wheeler in State Court prior to the commencement of this action.

ed by the promissory notes of Dalton Smith and Robert A. Wheeler. These two loans, totalling $90,000, executed about six weeks apart, were secured by pledges of 120,000 shares of common stock of Power Oil Company, a West Virginia corporation with its corporate office in Houston, Texas. After the loans became delinquent, plaintiff bank attempted to sell the pledged stock but discovered that it was not registered under the provisions of the Securities Act of 1933, and that in fact the stock was restricted and not therefore subject to transfer or negotiation on the open market. It also was discovered that the stock was owned by defendant William Nathan, who had endorsed the certificates in blank and had "loaned" the certificates to Smith and Wheeler to enable them to execute the loans. At the time of the transactions, however, both makers of the notes represented to the bank that they owned the stock and that it was fully negotiable and transferable. No restrictive legend or notice of any kind appeared on the face of the stock and the bank made no independent inquiry.

■ Under the design of the Securities Act of 1933, before determining the liability of the defendants herein, it is necessary to decide whether Smith and Wheeler as pledgors of the stock are subject to liability under the Act.

Section 12 (15 U.S.C. § 77l of the Act provides:

"Any person who—

"(1) offers or sells a security in violation of section 77e of this title, or

"(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

In short, Section 12 offers a plaintiff two theories under which he may impose civil liability on a defendant. Subsection (1) imposes liability on any person who offers or sells a security in violation of Section 5 (15 U.S.C. § 77e) which prohibits use of interstate commerce or of the mails to aid in the offer or sale of securities where no registration statement has been effected. The second theory provides that a plaintiff under Section 12 may recover for a sale effected by means of an untrue statement of material fact or a material omission of fact.

Under Section 12(1), there was a *prima facie* violation committed by Smith and Wheeler. There is ample evidence of the interstate nature of the transactions by use of telephonic communications and the mails. There was no registration statement in effect at the time of the transactions. That we are dealing with a "security" within the definition of Section 2(1) (15 U.S.C. § 77b(1)) is clear. Whether there was a "sale" within the definition of Section 2(3) (15 U.S.C. § 77b(3)) has not been seriously questioned by defendants. The pledge of a security as involved here constitutes a "disposition of a security

or interest in a security for value" and a "sale" within the meaning of the Act. *Cf.* S. E. C. v. Guild Films Company, Inc., 178 F.Supp. 418 (S.D.N.Y.1959), aff'd 279 F.2d 485 (2d Cir. 1960), cert. den. *sub nom.* 364 U.S. 819, 81.S.Ct. 52, 5 L.Ed.2d 49 (1960).

Plaintiff bank has established that the pledge of the stock by Smith and Wheeler violated the provisions of Section 12(1) and that the transactions by Smith and Wheeler were not exempt within the meaning of Section 4. (15 U.S.C. § 77d as amended, Pub.L. 88–467, 78 Stat. 565 (1964).)

Moreover, Section 12(2) liability has been established by false representations and material omissions made by Smith and Wheeler with respect to ownership, negotiability and transferability of the stock. Unlike Section 12(1), liability exists under Section 12(2) even with respect to securities and transactions which are exempt from the registration and prospectus requirements of the Act. The purchaser (or pledgee) need only prove that there was a material misstatement or omission of which he had no knowledge. Winter v. D. J. & M. Investment & Construction Corp., 185 F. Supp. 943 (S.D.Cal.1960). See Moore v. Gorman, 75 F.Supp. 453 (D.C.N.Y. 1948); Murphy v. Cady, 30 F.Supp. 466 (D.Me.1939), aff'd 113 F.2d 988 (1st Cir. 1940), cert. den. 311 U.S. 705, 61 S. Ct. 175, 85 L.Ed. 458 (1940).

Both Sections 12(1) and 12(2) require privity between the seller and purchaser for primary liability to be incurred. "[A defendant] * * * shall be liable *to the person purchasing such security from him.*" (Emphasis added.) See Winter v. D. J. & M. Investment & Construction Corp., *supra;*

Lynn v. Caraway, 252 F.Supp. 858 (W.D. La. 1966), aff'd 379 F.2d 943, cert. den. 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362. Such privity with plaintiff facially existed only with respect to Smith and Wheeler, but not with respect to the defendants here. The asserted liability of the defendants in this action must be *derivative* in nature.

## WILLIAM NATHAN

▉ William Nathan's liability is predicated on two closely related theories available under the Act. First, plaintiff contends that Nathan was in a controlling relationship with respect to Smith and Wheeler; and second, plaintiff urges that Nathan was a disguised principal in the transaction.

Based on the totality of evidence presented, we find that Nathan was in fact in a controlling relationship.[2] He "loaned" the security to Smith and Wheeler, as he had done several times in the past, and he received at least a portion of the money that came from the loans. Furthermore, on several occasions he promised plaintiff bank's president that he would pay the debt or substitute collateral, also, as he had done several times in the past.

In addition to Nathan's derivative liability resulting from his controlling relationship, there is ample evidence to find that he was in fact a principal in the transaction. One cannot interpose third parties in such a transaction and defeat the purposes of the Act. *Cf.* Buchholtz v. Renard, 188 F.Supp. 888 (S.D.N.Y. 1960).

▉ Nathan's primary defense is that plaintiff bank was contributorially negligent in failing to exercise due diligence in ascertaining the status of the

2. Section 15 (15 U.S.C. § 77o):

"Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

stock's transferability. The defense of contributory negligence is totally without merit. That defense, under these facts, is not compatible with the purpose of the Act in providing a "full and fair disclosure of the character of securities * * * ."

" * * * The defenses of contributory negligence or of assumption of risk, however, are not available to a defendant at common law with regard to actions of deceit, and certainly are not available to a defendant under Section 12(2) of the '33 Act. In fact, as discussed infra, the only defense under Section 12(2) based specifically on the conduct of the plaintiff is that plaintiff did have knowledge of the untruth or omission." Johns Hopkins University v. Hutton, 297 F.Supp. 1165, 1221–1222 (D.Md.1969).

Similarly, simple contributory negligence is not a defense to Section 12(1) liability.

■ Nathan further urges that he should not be subjected to liability because of the bank's actions in disposing of the pledged stock. The bank, after determining the status of the stock, in an attempt to mitigate its damages, disposed of the stock (after inserting a restrictive legend) to a prior stockholder of Power Oil Company stock for the sum of $60,000.00, thus leaving $30,000.00 of the debt unsatisfied. Nathan, relying on Louisiana's Deficiency Judgment Act,[3] urges that such a non-judicial disposition should bar further relief. We find this contention is without merit. Section 12 provides for the case of the resale of stock and the measure of damages:

"[Plaintiff] may recover the consideration paid for such security with interest thereon, less the amount of any

income received thereon, upon the tender of such security, *or for damages if he no longer owns the security.*" (Emphasis added.)

There is no statutory requirement for appraisal and judicial disposition to enable plaintiff to secure damages. Moreover, defendants do not question that the amount received is inadequate or the good faith of the disposition. We hold that the Louisiana Deficiency Judgment Act is without application to this case.

We find that Nathan was in a controlling relationship (as well as disguised principal), and hold that he is liable to plaintiff for its damages of $30,000.00 plus interest, as fixed by Louisiana law.

## THE POWER OIL DEFENDANTS

As a portion of the consideration for a land deal with Power Oil Company, Nathan received 300,000 shares of Power Oil common stock. He later caused part of that issuance to be broken down into 10,000 share certificates by Power Oil's transfer agent (who was subsequently replaced for unsatisfactory performance of his duties). These are the 10,000 share certificates which were subsequently "loaned," after being endorsed in blank, to Smith and Wheeler and pledged by them to American Bank.

In order for plaintiff to prevail against any but its direct seller, it must invoke the control provisions of Section 15. See Winter v. D. J. & M. Investment & Construction Corp., *supra;* Loss, Securities Regulation, p. 991. Thus, in order for plaintiff to collect from the Power Oil defendants, it must show that there was a controlling relationship between those defendants and Nathan (or Smith and Wheeler).

■ After trial, plaintiff amended[4] its complaint to allege such con-

---

3. La.Code Civ.P., art. 2771.

4. In addition, plaintiff urged for the first time in its *rebuttal brief* a novel plea of "estoppel" as a basis for imposing liability on the Power Oil defendants for their failure to restrictively legend the stock.

That plea is based primarily on the Louisiana and Texas statutory duty to place restrictions on the face of stock certificates for them to have effect *against the issuer.* Assuming, without deciding, that the plea was timely made, we do not find this contention to be of

trol liability. This belated amendment resulted in no prejudice or surprise.[5] The Pre-trial Stipulation apparently at the instance of the Power Oil defendants stated, "Power Oil Company, R. H. Martin, and M. W. Joste further claim that William Nathan was not *under the control* of the corporation or any of the corporation officers." (Emphasis added.) Due to the interrelated nature of the Act, it must be presumed that the Power Oil defendants were aware of the necessity of and the attempt to show control on their part.

Plaintiff has failed, however, to establish that the Power Oil defendants were in a controlling relationship with respect to Nathan (or Smith and Wheeler).[6] There was no evidence presented that Power Oil Company or its officers participated directly or indirectly in the suspect transaction or even knew of its existence prior to the bank's request to transfer the pledged stock.

Even though the control provisions of the Act have been liberally construed, there is no evidence to support a finding that the Power Oil defendants controlled Nathan (or Smith and Wheeler), nor is there evidence to find that Nathan was acting as an "underwriter" (Section 2(11), 15 U.S.C. § 77b(11)) on their or anyone's behalf. *Cf.* Winter v. D. J. & M. Investment & Construction Corp., *supra.*

Accordingly, we hold that Power Oil Company, R. H. Martin, and M. W. Joste are not liable under the civil liability provision of the Securities Act of 1933.

merit and plaintiff has cited no authority to support its contention. Since plaintiff has in fact disposed of the stock, the statutory basis for estoppel it alleges is no longer applicable.

5. See, Fed.Rules Civ.P. 15(b).

6. Plaintiff relies heavily on the contention that, because Power Oil had the power to control disposition of the stock and that since Nathan did in fact dispose of the stock, a controlling relationship must have existed.

A proper decree should be presented by counsel for plaintiff, after approval as to form.

"If a person believes that he has the power to control and exercises that power upon another who is convinced that such power exists—it cannot be denied that the power to control is in fact present."

The fallacies in this contention are: (1) it assumes that control is in fact exercised, the question to be proved, and (2) the mere possibility of exercising control is not conclusive; control actually *must* be exercised.